IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 10-617 |
| ) | Judge Nora Barry Fischer |
| ANTHONY D. CUDA and ) | |
| BRIAN DANKIS, ) | |
| ) | |
| Defendants. ) | |

## **MEMORANDUM OPINION**

### I. INTRODUCTION

In this action, the United States of America ("United States") seeks to reduce to judgment the trust fund recovery penalty assessments made against the Defendants, Anthony D. Cuda ("Cuda") and Brian Dankis ("Dankis"). (Docket No. 1 at ¶ 1). Pending before the Court is the United States' Motion for Summary Judgment. (Docket No. 33). The motion is fully briefed and is ripe for disposition. After consideration of the parties' briefing and the record before it, this Court finds that summary judgment is appropriate. Therefore, the United States' motion is GRANTED.

### II. BACKGROUND

#### a. The Complaint and Answer

The Complaint alleges that Cuda, on behalf of Seneca Area Emergency Services, Inc. ("SAES"), was required to collect, account for, and pay to the Internal Revenue Service ("IRS") certain taxes under the Federal Withholding and Federal Insurance Contributions Act ("FICA") for the taxable periods that ended March 31, June 30, September 30, and December 31, 2005. (Docket No. 1 at ¶ 9). The United States alleges that Cuda willfully failed in these duties. (*Id.* at

1

¶ 10). Trust fund penalties in the amount of $73,680.69 were assessed against Cuda. (*Id.* at ¶ 11). The United States claims that Cuda was given notice of these penalties. (*Id.* at ¶ 12). Because statutory additions continued to accrue, the total penalty was $79,078.66 at the filing of the Complaint. (*Id.* at ¶¶ 14-15). Accordingly, the United States requests that this Court render judgment against Cuda in the amount of $79,078.66, plus statutory additions accruing from May 10, 2010, until paid. (*Id.* at ¶ A).

Defendant Cuda's Answer is unsurprising. Defendant claims that he was not a person required to collect, account for, and pay the taxes. (Docket No. 3 at ¶ 9). Instead, Cuda avers that Dankis was the chief financial officer and would have been the person required to collect, account for, and pay the taxes. (*Id.*). The Answer admits all allegations as to Dankis. (*Id.* at ¶¶16-23).

### b. Statement of Facts

SAES is a non-profit corporation that provides ambulance and emergency medical services to certain communities outside of Pittsburgh. (Docket No. 37 at ¶ 1). Dankis began volunteering with SAES in 1997 and was hired as a paid paramedic in 1999. (Docket No. 33-5 at 11:8-11:14) (hereinafter, Dankis Dep.). Cuda joined SAES in 1998 as a volunteer paramedic and was later hired as Operations Director and Chief, a paid position in which Cuda was tasked with overseeing day-to-day operations of SAES. (Docket No. 33-4 at 11:8-11:14) (hereinafter, Cuda Dep.). In October of 2005, Cuda hired Jeffrey Benincosa ("Benincosa") to handle SAES's in-house billing. (Docket No. 33-6 at 16:3-24) (hereinafter, Benincosa Dep.).

As Operations Director and Chief, Cuda was initially responsible for recruiting volunteers, maintaining employee schedules, handling patient complaints, and community outreach programs, among other things. (Cuda Dep. at 13:20-14:8). He eventually had the

authority to: authorize the billing of patients and insurance companies, hire and fire employees underneath him, attend board meetings, help craft company policy, open and close company bank accounts, help determine employee salaries, sign certain documents and checks on SAES's behalf, review and submit employee hours to payroll, order supplies, and provide input on how to prioritize SAES's bill payments. (Docket No. 34 ¶ 21) (citing various segments of the Cuda, Dankis and Benincosa Depositions). Cuda was not in charge of SAES's administrative department, which controlled finances, though he frequently assisted the department. (Cuda Dep. at 13:3-13:8; 32:18-34:1). While Cuda did not have a financial background, he would occasionally handle payroll when SAES's chief financial officer was unavailable. (Cuda Dep. at 43:17-22; 113:18-25).

In 2003, Cuda promoted Dankis to assistant director, and Dankis began reporting directly to Cuda. (Dankis Dep. at 13:1-7). That same year, office manager Gary Pennington began embezzling money from SAES and stopped paying the company's bills, including its federal payroll taxes. (Cuda Dep. at 28:7-29:10; 29-15-20; 38:1-16; 95:3-8). In May 2003, Cuda learned that Pennington had not paid SAES's federal payroll taxes for over a year, and sometime in 2004 he met with the Internal Revenue Service ("IRS") to discuss the outstanding taxes. (Cuda Dep. 39:22-40:8; 67:23-68:12; 68:23-69:13). Pennington was discharged from his position as office manager in 2004, and Cuda and the board of directors delegated the office manager's responsibilities, including the responsibility of managing accounts payable, to Dankis. (*See* Dankis Dep. 13:15-22; Benincosa Dep. at 26:14-22).

In 2005, due to the financial ramifications of Pennington's actions and insufficient revenue, SAES could only manage to pay some of its bills, (Benincosa Dep. 24:6-14; Dankis Dep. at 65:14-66:17), and cuts were made to keep operating on a day-to-day basis. (Cuda Dep. at

22:5-17, 37:14-22, 45:23-46:12; Dankis Dep. at 32:20-25, 56:5-14). For the 2005 calendar year, Dankis, as SAES's chief financial officer, was responsible for all of the company's expenses, including tax payments to the IRS. (Cuda Dep. at 85:16-24). He would meet daily with John Tomichek[1] "to discuss the financials of the organization." (Docket No. 33-9 ¶ 12; Cuda Dep. at 43:10-15).

For the tax period ending on March 31, 2005, Federal Withholding and FICA taxes ("payroll taxes") withheld from the wages of SAES employees were not paid over to the IRS. (Docket No. 33-7 at 2). In May 2005, Dankis sent Cuda an e-mail notifying him of a "tax situation." (Cuda Dep. at 93:17-94:24; Dankis Dep. 69:24-71:21, 72:24-74:3; Docket No. 37 at 3). Despite the e-mail's clear reference to *taxes*, Cuda claims that he believed the e-mail was about mortgage issues pertaining to a refinancing of property, rather than the nonpayment of payroll taxes. (Cuda Dep. at 94:15-24).

SAES's payroll taxes for the tax period ending on June 30, 2005 were not paid to the IRS (Docket No. 33-7 at 8), and in July, Dankis received notification from SAES's accountant[2] that an IRS agent was attempting to collect the company's unpaid taxes for the year. (Dankis Dep. at 75:13-76:10). That same month, Cuda was made aware of the outstanding payroll taxes, and the IRS' demand for payments. (Cuda Dep. at 72:25-73:19; 74:15-25). Cuda spoke with Tomichek about the IRS situation, and Cuda suggested that Tomichek "follow up and make sure that it's … handled." (Cuda Dep. at 72:25-73:19). Cuda also discussed the situation with Dankis, who informed Cuda he would "take care of it." (Cuda Dep. at 78:19-79:12). Dankis falsely informed

---

[1] Tomichek was SAES's chairman of the board of directors in 2005. (Docket No. 33-4 at 22:18-22).

[2] It appears that SAES's accountant is Brian Dodson, as Cuda's statement of fact refers to "Seneca's accountant," (Docket No. 38 at ¶ 7), and the cited portion of the deposition refers to Dodson. (*See* Dankis Dep. 73:1-17).

SAES's accountant that a tax payment had been made to the IRS. (Dankis Dep. at 77:19-78:13). Still, Dankis did not make any payments to the IRS. (Dankis Dep. at 78:11-79:5). On August 6, 2005, Dankis was notified that he and Cuda might have a 100% tax penalty assessed against them by the IRS for SAES's unpaid 2005 taxes, but he did not convey that information to Cuda. (Dankis Dep. at 81:12-14; 83:3-15). Despite the warning, payroll taxes owed to the IRS were not paid for the tax period ending on September 30, 2005. (Docket No. 33-7 at 12).

Though Cuda knew of, and had the authority to authorize payment of, the delinquent taxes, he did not do so and instead relied on Dankis' assurances that the payroll taxes would be handled. (Cuda Dep. at 78:19-79:12). Cuda does, however, claim that he would inform the chairman of the board when tax issues were brought to his attention. (Cuda Dep. at 79:6-12; 88:14-20). Cuda testified that Dankis did not, at any point, approach SAES's board of directors about the company's tax problems, nor did he keep Cuda properly apprised of the situation throughout the remainder of 2005. (Dankis Dep. at 43:2-10, 75:5-7). SAES kept operating despite the tax deficiency, and though the company received sufficient funds in 2005 to pay its outstanding payroll taxes, it used said funds for other financial obligations. (*See* Docket No. 33-13 (copies of SAEC's bank statements); Dankis Dep. 79:15-80:1).

In October 2005, Cuda hired Benincosa to oversee in-house billing for SAES (Benincosa Dep. at 16:3-24), and, when Dankis resigned later that year, Benincosa was promoted to office manager, taking on the responsibility of handling accounts receivable and accounts payable. (Benincosa Dep. at 17:1-18:14). As Dankis had done, Benincosa began reporting directly to Cuda and the Board of Directors. (Benincosa Dep. at 25:15-20, 27:23-28:1). On Dec. 7, 2005, due in part to its outstanding tax liability, SAES filed for bankruptcy protection under Chapter 11 of the bankruptcy code. (Cuda Dep. at 74:3-7; Docket No. 37 at 4).

5

Once again, SAES's payroll taxes were not paid for the tax period ending on December 31, 2005. (Docket No. 33-7 at 16). In late 2005, an IRS agent met with Benincosa to discuss SAES's unpaid payroll taxes for the 2005 calendar year. (Benincosa Dep. 31:8-33:6, 34:1-12). Benincosa informed Dankis[3] and Cuda about the IRS payroll tax problem, and both admitted to him that they were aware of the issues. (Benincosa Dep. at 34:19-35:18). While Cuda had notice of SAES's ongoing tax problems, he testified that he did not learn that no payments were being made towards the company's outstanding payroll taxes until 2006. (Cuda Dep. at 78:19-23; 85:11-24). There is nothing in the record to suggest that Cuda made any attempt to pay off the taxes at that time. Cuda left SAES in August 2006 when his position was eliminated. (Cuda Dep. at 89:23-25).

On October 18, 2006, SAES and the IRS filed a Stipulation and Agreement laying out the terms for the repayment of SAES's outstanding payroll taxes. (Docket No. 37 at 4). On November 13, 2006, a Secretary of Treasury delegate operating under 26 U.S.C. § 6672[4] assessed a penalty against Cuda for the taxable periods ending on March 31, June 30, September 30, and December 31, 2005, for SAES's unpaid payroll taxes, amounting to $73,680.69. (*See* Docket No. 33-7). In accordance with 26 U.S.C. § 6303 (Docket No. 1 ¶ 12), notices of the

---

[3] After his termination, Dankis was retained by SAES as a paramedic on an as-needed basis. (Benincosa Dep. at 34:23-35:2).

[4] 26 U.S.C. § 6672(a) provides, in relevant part:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

6

assessments and demands for payment were given to Dankis who assured Cuda they'd be "handled through the business operation." (Docket No. 3 ¶ 12).

On December 7, 2006, in conjunction with SAES and the IRS' Stipulation and Agreement, the Bankruptcy Court issued an order confirming SAES's Chapter 11 Plan. (Docket No. 37 at 4-5). The record does not make clear SAES's current financial status.

### c. Procedural History

The instant Complaint was filed on May 10, 2010. (Docket No. 1). Cuda filed his Answer on August 30, 2010. (Docket No. 3). On September 2, 2010, the United States requested entry of default against Dankis, (Docket No. 7), and default was entered on September 7, 2010. (Docket No. 8). Eight days later, the United States requested entry of default judgment against Dankis, (Docket No. 9), and judgment was entered on September 16, 2010. (Docket No. 10).

The Court then held its case management conference on October 14, 2010. (Docket No. 16). At this conference, the parties agreed to non-binding arbitration under the Court's mandatory ADR rules.[5] (*See* Docket Nos. 14, 16). After completion of arbitration, the parties participated in a post-fact discovery status conference, whereat they informed the Court that no jury would be necessary if the matter proceeded to trial. (Docket No. 27). A summary judgment motion schedule issued, (Docket No. 28), and the pending motion was timely filed. (Docket No. 33).

## III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

[5] Local Civil Rule 16.2 makes ADR mandatory, and allows parties to select from mediation, early neutral evaluation, and arbitration. L.Cv.R. 16.2(C).

Civ. P. 56(a).[6] Pursuant to Rule 56, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A motion for summary judgment will only be denied when there is a genuine issue of material fact, i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). The mere existence of some disputed facts is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

In determining whether the dispute is genuine, the Court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility. Rather, the Court is only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy*, 413 F.3d at 363; *see also Simpson v. Kay Jewelers*, 142 F.3d 639, 643 n.3 (3d Cir. 1998) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994)). Summary judgment is precluded where disputes exist over what inferences can reasonably be drawn from the facts, even though the underlying facts may be undisputed. *Nathanson v. Medical College of Pennsylvania*, 926 F.2d 1368, 1380 (3d Cir. 1991). In evaluating the evidence, the Court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor. *Reeves v. Sanderson Plumbing*

---

[6] Rule 56 was amended effective December 1, 2010. The explanatory notes to the 2010 amendments explain that while the language in Rule 56 was changed from "issue" to "dispute," the "standard for granting summary judgment remains unchanged." Thus, the Court considers binding prior jurisprudence of the United States Supreme Court and the United States Court of Appeals for the Third Circuit in arriving at the standard to be employed in addressing the instant motion.

*Products, Inc.*, 530 U.S. 133, 149-151 (2000); *Kirleis v. Dickie, McCamey & Chilcote*, 560 F.3d 156, 159, & n. 3 (3d Cir. 2009); *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves*, 530 U.S. at 150 (quoting *Liberty Lobby, Inc.*, 477 U.S. at 255).

## IV. DISCUSSION

### a. The Parties' Arguments

The United States opened its argument by claiming that, where an employer fails to properly withhold and remit to the United States income and social security taxes from employee wages, "responsible persons" who are "wilfully [sic]" involved in the employer's failure to pay are held personally liable for the unpaid tax under 26 U.S.C. § 6672. (Docket No. 35 at 1-2).

The United States argues that Cuda carries the burden of proof on this motion because the United States "establish[es] a prima facie case of liability merely by offering into evidence a certified copy of the Commissioner's assessment." (Docket No. 35 at 4) (citing *Psaty v. United States*, 442 F.2d 1154, 1159-60 (3d Cir. 1971)). Once the United States has introduced proof of an assessment, the burden shifts to the taxpayer to disprove liability. (Docket No. 35 at 4) (citing *United States v. Pomponio*, 635 F.2d 293, 296 (4th Cir. 1980); *Brounstein v. United States*, 979 F.2d 952, 954 (3d Cir. 1992); *United States v. Vespe*, 868 F.2d 1328, 1331 (3d Cir. 1989)). Thus, it is left to Cuda to prove, by a preponderance of the evidence, that he is either not a "responsible person" or that he did not act "willfully." (Docket No. 35 at 7).

Cuda admits that he carries the burden of proof. (Docket No. 37 at 2). He likewise admits that he is a "responsible person" under the statute. (*Id.*). However, Cuda challenges the United States' characterization of his actions as "willful" on three grounds. First, he argues that he did

not have knowledge of the outstanding payroll taxes. (*Id.* at 3). Second, Cuda seems to argue that Dankis's actions insulate him from liability, or at least that the Court should not rely on his testimony at the summary judgment stage. (*Id.* at 3-4). Third, it appears that Cuda argues that SAES's bankruptcy should insulate him from liability. (*Id.* at 4-5).

The United States responds to each point. As to the first, the United States argues that the record clearly shows that Cuda knew of the outstanding taxes. (Docket No. 39 at 2-3). The United States then argues that Cuda's reliance on Dankis's actions is misplaced because § 6672 places liability on "all responsible persons, and not just the most responsible person." (*Id.* at 3) (emphasis in document) (citing *Hagen v. United States*, 485 F.Supp.2d 622, 628 (D.Md. 2007)). Further, the United States argues that reliance on another is not a sufficient basis for a responsible person to defend himself against a claim under § 6672. (Docket No. 39 at 3) (citing *Greenberg v. United States*, 46 F.3d 239, 244 (3d Cir. 1994)). Finally, the United States asserts that the bankruptcy is not relevant to Cuda's liability because such liability arises at the time that the taxes go unpaid and because assessments against responsible persons are "separate and distinct" from liability of the employer. (Docket No. 39 at 6) (citing *East Wind Indus. V. United States*, 108 Fed. App'x 723, 727 (3d Cir. 2004)).

b. **Non-Payment of Payroll Taxes**

Under the Internal Revenue Code ("Code"), employers are required to deduct and withhold federal income taxes and FICA taxes from employee wages. *U.S. v. Mitchell*, 82 Fed. Appx. 781, 784 (3d Cir. 2003) (citing 26 U.S.C.A. §§ 3102, 3402; *U.S. v. Bisbee*, 245 F.3d 1001, 1005 (8th Cir. 2001)). These withheld payroll taxes are treated as "a special fund in trust for the United States." 26 U.S.C.A. § 7501(a). The Code provides, in pertinent part, that:

> [a]ny person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully

> account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall . . . be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a).

This statute provides a two pronged test for imposing liability on an individual for failure to turn over payroll taxes to the United States Government. First, the individual must be a "responsible person" within the meaning of the statute, and second, the individual must have acted "willfully" when he or she failed to pay the taxes in question. *Greenberg v. U.S.*, 46 F.3d 239, 242 (3d Cir. 1994). A tax assessment by an IRS commissioner is presumptively correct, resulting in a *prima facie* case of liability against the taxpayer. *Freck v. I.R.S.*, 37 F.3d 986, 992 n. 8 (3d Cir. 1994) (citing *United States v. Janis*, 428 U.S. 433, 440-41 (1976)). Once certified copies of a § 6672 assessment are presented to the court, the burden of proof shifts to the taxpayer who then must prove, by a preponderance of the evidence: "(1) that he was not a responsible person within the meaning of the statute, or (2) that he did not willfully fail to pay the amount due to the IRS." *Brounstein v. United States*, 979 F.2d 952, 954 (3d Cir. 1992).

### i. The "Responsible Person" Standard

A "responsible person" for the purposes of § 6672 is any corporate employee or officer with a duty to "collect, truthfully account for, or pay over any tax due the United States." *Greenberg*, 46 F.3d at 242-43 (quoting *United States v. Carrigan*, 31 F.3d 130, 133 (3d Cir. 1994)). Responsibility arises from an employee's "status, duty, or authority" rather than his or her knowledge. *Greenberg*, 46 F.3d at 243. To be considered a responsible person under § 6672, a person does not need to have exclusive control over his or her company's finances, but merely significant control. *Vespe*, 868 F.2d at 1332.

Significant control is established when a person has the last say or significant input about which bills or creditors are to be paid. *Quattrone Accountants, Inc. v. I.R.S.*, 895 F.2d 921, 927 (3d Cir. 1989). The Court of Appeals has also held that when determining whether a person has significant control, the following factors should be considered: "(1) the duties of the officer as outlined by the corporate by-laws; (2) the ability of the individual to sign checks of the corporation; (3) the taxpayer's signature on the employer's federal employment or other tax returns; (4) the identity of the officers, directors and shareholders of the corporation; (5) the identity of the individuals who hired and fired employees; and (6) the identity of the individual(s) who were in charge of the financial affairs of the corporation." *Carrigan*, 31 F.3d at 133; *accord Mitchell*, 82 Fed. Appx. at 785.[7]

Cuda has admitted that he qualifies as a "responsible person" for purposes of § 6672. (*See* Docket No. 37 at 2). Thus, the first element of liability under § 6672 is not at issue here. The question is whether Cuda's actions were willful, such that he could be exposed to liability.

### ii. The Willfulness Standard

Although Cuda does not challenge his status as a "responsible person," he does argue that he was not willful in SAES's failure to pay its taxes. A willful act for 26 U.S.C. § 6672 purposes occurs when a responsible person makes "a voluntary, conscious and intentional decision to prefer other creditors over the government." *Quattrone*, 895 F.2d at 928. This can include paying net wages to employees while there are outstanding payroll taxes. *Greenberg*, 46 F.3d at 244. Thus, knowledge of unpaid taxes and the conscious decision to pay other creditors before paying the United States constitutes willfulness. *See Quattrone*, 895 F.2d at 928 (citing *Wall v. United States*, 592 F.2d 154, 163 (3d Cir. 1979)).

---

[7] *Greenberg* includes a very similar list, adding that courts should consider the contents of the corporate bylaws. *See Greenberg*, 46 F.3d at 243.

A responsible person can also act willfully when he or she displays "reckless disregard for whether taxes have been paid." *Brounstein*, 979 F.2d at 956. The reckless disregard standard is met when the taxpayer: "(1) clearly ought to have known that (2) there was a grave risk that withh[eld] taxes were not being paid and … (3) he was in a position to find out for certain very easily." *Carrigan*, 31 F.3d at 134 (quoting *Wright v. United States*, 809 F.2d 425, 427 (7th Cir. 1987)). This standard can also be met when a responsible person is given notice that payroll taxes are not being paid, but takes no steps to investigate the situation or correct mismanagement. *Greenberg*, 46 F.3d at 244 (quoting *Morgan v. United States*, 937 F.2d 281, 286 (5th Cir. 1991)).

A responsible person's action or inaction does not need to be performed with bad intent for it to be considered willful. *Greenberg*, 46 F.3d at 244. It is sufficient that the responsible person acted knowingly or recklessly. *Id.*

### 1. Knowledge and Payments to Other Creditors

Cuda claims that "[t]he record establishes that [he] did not have knowledge that taxes were not being paid during 2005." (Docket No. 37 at 3). A true lack of knowledge would immunize him from liability for the unpaid taxes. However, the Court finds that there is no genuine issue of fact as to whether Cuda was aware of the unpaid taxes. By Cuda's own admission, he was made aware of the IRS demand for payments as early as July 2005. (Docket No. 38 at ¶ 19).[8] With this knowledge, Cuda should have opted to pay SAES's federal taxes. Instead, SAES continued to pay off its other creditors. For example, the United States has submitted checks dated *after* Cuda admitted to knowledge of the tax obligations. (*See*, *e.g.*,

---

[8] The United States argues that a May 18, 2005 e-mail supports a finding that Cuda had knowledge of the unpaid taxes. (Docket No. 39 at 2). The Court will address this e-mail below, *infra* Part IV.b, as it finds that this e-mail supports a finding of recklessness.

Docket No. 33-12 at 3-14, 27, 29-34). Cuda testified at his deposition that he signed several checks on dates in September, October, November and December of 2005. (Cuda Dep. at 104:2-111:6). Therefore, checks were signed and issued after Cuda, a "responsible person," became aware of the unpaid taxes. By Cuda's own admission, some of these checks were signed by him. (*Id.*). Thus, Cuda was a "responsible person", (Docket No. 37 at 2), who had knowledge of unpaid taxes, (Docket No. 38 at ¶ 19), and who chose to pay other debtors before paying off SAES's tax liabilities. (*See* Cuda Dep. at 104:2-111:6; Docket No. 33-12). All of these uncontested facts are derived from Cuda's own deposition or statement of facts. Cuda has, thus, established his liability through his own admissions, and, therefore, there are no disputes over the material facts as to Cuda's liability.

Further, when "an individual has been a responsible person throughout the period when the taxes should have been collected and paid, but did not have knowledge of the tax delinquency until later, he has a duty to pay over all after-acquired funds to the IRS." *In re Branagan*, 345 B.R. 144, 168 (E.D.Pa. 2006) (citing *Vespe*, 868 F.2d at 1334). Cuda admits to learning of the unpaid taxes in July 25 – after both the March and June tax periods – and was, therefore, under a duty to pay off these debts with after-acquired funds. As indicated by the copies of checks submitted by the United States, (*see* Docket No. 33-12; Cuda Dep. at 104:2-111:6), Cuda used the after-acquired funds to pay off other creditors before (or without) paying off the United States. (*Id.*). Again, the facts are not in dispute and support a finding of liability.

Cuda attempts to protect himself from liability by arguing that he was in some way misled by Dankis or that the Court should not rely on Dankis's testimony. (Docket No. 37 at 3-4). Cuda's arguments are misplaced. First, whether or not Dankis failed to pay taxes, (*id.* at 4), is not relevant to Cuda's liability. *See Hagen*, 485 F.Supp.2d at 628 (Section 6672 "applies to all

responsible persons, and not just *the most responsible* person."). Assurances of another that taxes will be taken care of is not a defense to liability under § 6672. *Greenberg*, 46 F.3d at 244 (citing *Denbo v. United States*, 988 F.2d 1029, 1033-34 (10th Cir. 1993)). Second, the Court's finding of liability is based on Cuda's own admissions, not statements made by Dankis. Assertions, at the summary judgment stage, that are contrary to those made at deposition are not sufficient to create a material dispute of fact. *Cf. Martin v. Merrell Dow Pharmaceuticals, Inc.*, 851 F.2d 703, 705 (3d Cir. 1988) (finding that a party cannot create a dispute of material fact by "flatly contradict[ing]" earlier sworn statements). Once Cuda was made aware of the unpaid taxes, it was his duty to ensure that they were paid – before any other creditors of SAES were paid. He failed in that duty.

### c. Recklessness

A responsible party may be found willful for recklessness when the taxpayer "(1) clearly ought to have known that (2) there was a grave risk that withh[eld] taxes were not being paid and … (3) he was in a position to find out for certain very easily." *Carrigan*, 31 F.3d at 134 (quoting *Wright v. United States*, 809 F.2d 425, 427 (7th Cir. 1987)). In the Court's mind, this is where Dankis's May 2005 e-mail becomes particularly relevant. Cuda admits to receiving an e-mail from Dankis that references Dankis's "irresponsible management with the taxes…" (Docket No. 33-4 at 94:2-14). This e-mail was dated May 18, 2005. (*Id.* at 94:25-95:2).

Cuda claims that he was confused as to the meaning of this e-mail. (*See* Cuda Dep. at 94:15-24). It is clear from the record that the responsibilities of office manager were not transferred to Dankis until 2004. (*See* Dankis Dep. 13:15-22; Benincosa Dep. at 26:14-22). This post-dates Cuda's awareness of SAES's earlier, 2003, tax problems. (Cuda Dep. 39:22-40:8; 67:23-68:12; 68:23-69:13). Thus, Dankis's reference to his *own* irresponsible management of

15

taxes in 2005, as distinguished from the 2003 problems that occurred before Dankis took over as office manager, "clearly ought to have" made Cuda aware that "there was a grave risk that withh[eld] taxes were not being paid." *Carrigan*, 31 F.3d at 134. Cuda, as Operations Director and Chief, was clearly "in a position to find out for certain very easily." *Id.* He did not do so. His failure to do so, regardless of intent, is enough, in this Court's estimation, to establish willful recklessness. *Greenberg*, 46 F.3d at 244.

### d. Cuda's Bankruptcy Defense

Cuda's final argument, made without any citation to legal authority, is that SAES's bankruptcy should mitigate his liability. (*See* Docket No. 37 at 4-5). This argument is wholly without merit. "It is no defense [to a claim under § 6672] that [a] corporation was in financial distress…" *Id.*

The United States observes, correctly, that a responsible person becomes liable on the date that the corporation is unable to remit withheld taxes. *See Newsome v. United States*, 431 F.2d 742, 746 (5th Cir. 1970) (A responsible person "is only liable under section 6672 if the corporation does not pay over the withheld taxes at the date prescribed in the regulations."). Thus, Cuda's liability for the unpaid taxes arose as of the dates those taxes went unpaid. His personal liability under § 6672 "is separate and distinct from that imposed upon the employer…" *East Wind Industries, Inc. v. United States*, 103 Fed. App'x 723, 727 (3d Cir. 2004) (citing *Datlof v. United States*, 370 F.2d 655, 656 (3d Cir. 1966)); *see also Spivak v. United States*, 360 F.2d 612, 615 (2d Cir. 1967). Thus, SAES's bankruptcy has no bearing on Cuda's liability. *See generally Maguire v. United States*, 1980 WL 1518 (W.D.N.Y. March 7, 1980) (finding that a responsible person could still be held liable for taxes assessed against an entity that went bankrupt after the assessment).

## V. CONCLUSION

For the foregoing reasons, the Court finds that the United States is entitled to summary judgment. Appropriate Orders follow.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

cc/ecf: All counsel of record

Date: October 4, 2011